IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

SHARESE M. WELLS, as   :
Administrator for the Estate of   :
Robert K. Chambers,   :
  :
   Plaintiff,   :
  :
v.   :
  :    No. 5:13-CV-24 (CAR)
CULLEN TALTON, in his official   :
capacity as Sheriff of Houston   :
County, and STEVEN GIDDEN, in his :
individual capacity,   :
  :
   Defendants.   :
_____ :

## ORDER ON SUMMARY JUDGMENT

This case arises from the fatal shooting of Robert K. Chambers by Deputy Steven

Glidden with the Houston County Sheriff's Office.   Plaintiff Sharese M. Wells, as the

Administrator for Chambers' Estate, brings 42 U.S.C. § 1983 claims against Defendants

Cullen Talton, in his official capacity as the Sherriff of Houston County, and Deputy

Glidden, in his individual capacity, alleging that Glidden's use of deadly force violated

Chambers' Fourth and Fourteenth Amendment rights. Currently before the Court is

Defendants' Motion for Summary Judgment [Doc. 20].  After careful consideration, the

Court finds that Deputy Glidden is protected by qualified immunity because his use of

deadly force was reasonable under the circumstances and did not violate clearly

established law. Thus, the derivative claims against Sheriff Talton and the state law wrongful death claims also fail. Accordingly, Defendants' Motion [Doc. 20] is **GRANTED.**

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[2]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]  When ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the party opposing the motion.[4]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[3] *See id.* at 249-52.

[4] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

material fact" and that entitle it to a judgment as a matter of law.[5]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[6]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[7]

## BACKGROUND

In an excessive force case like the one at bar, the Court must construe the facts in the light most favorable to Plaintiff, but it must analyze the reasonableness of using deadly force from the perspective of the officer.[8]  With that understanding in mind, the Court derives the following facts from Deputy Glidden's testimony as well as a video from his taser camera, viewing this evidence in the light most favorable to Plaintiff.

On the morning of January 24, 2011, Steven Glidden, a deputy assigned to the Houston County Sherriff's Office Civil Division, was serving civil papers when he heard a radio broadcast alerting him to a residential burglary in progress.[9]  Because he was nearby, Deputy Glidden radioed in and was directed to assist in the investigation.[10] The dispatcher informed Glidden that the homeowner had walked in and heard

---

[5] *Celotex Corp.,* 477 U.S. at 323 (internal quotation marks omitted).
[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.,* 477 U.S. at 324-26.
[7] *See Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir. 1991).
[8] *See Troupe v. Sarasota Cnty., Fla.,* 419 F.3d 1160, 1168 (11th Cir. 2005).
[9] Decl. of Steve Glidden ¶ 6 ("Glidden Decl.") [Doc. 20-1].
[10] *Id.* at ¶ 6.

3

someone run out the back door.[11]  The homeowner did not see the intruder, and thus Glidden was given no physical description of the suspect.[12] But Glidden was warned that the unidentified suspect was possibly armed with a loaded .45 caliber pistol because a weapon matching that description was missing from the residence.[13]

Deputy Glidden pulled into the parking lot of a nearby middle school to check the grounds for the suspect.[14]  Finding nothing out of the ordinary in the school parking lot, Glidden decided to check the neighborhoods near the school in the vicinity of where the burglary occurred.[15] As Glidden approached a wooded area between the neighborhood and the school, he stopped his patrol car and started walking along a path through the wooded area back towards the school and the scene of the burglary.[16] While on this path, Glidden encountered a young black male wearing a large, black jacket with the hood over his head—later identified as Robert Chambers, the decedent in this case.[17]  When Glidden first noticed Chambers he was approximately fifteen feet away and seemed startled when he saw Glidden.[18]

---

[11] *Id.* at ¶ 7.
[12] Deposition of Steven Glidden 31:8-12 ("Glidden Dep.") [Doc. 30].
[13] Glidden Decl. ¶ 11.
[14] *Id.* at ¶ 8.
[15] *Id.* at ¶ 9.
[16] *Id.* at ¶ 10.
[17] *Id.* at ¶¶ 12, 28.
[18] *Id.* at ¶ 13.

According to Deputy Glidden, he told Chambers numerous times to remove his hands from his jacket pockets.[19] After his second command, Chambers asked "Why? What's going on?", but Glidden refused to answer.[20]  Instead, Glidden commanded Chambers again to take his hands out of his pockets and to take the hood of his jacket off.[21]  Chambers complied with Glidden's latter request by tilting his head back so the hood could fall off, but he kept his hands in his pockets.[22]  Chambers then began taking slow steps towards Glidden.[23]  At that point, Glidden testified that he did not feel threatened by Chambers, and he did not draw his weapon.[24]  As Chambers walked closer, Glidden asked Chambers where he lived, and Chambers indicated his mother lived in a subdivision nearby.[25]

When Chambers came within six inches of Glidden, he stepped to Glidden's right as if to walk by him.[26]  As he did so, Glidden remained still with his eyes focused on the area from which Chambers came to make sure no one was coming up from

---

[19] *Id*. at ¶¶ 14-15; Glidden Dep. 40:6-17.

[20] *See id*. at 40:11-16.

[21] *Id*. at 40:16-18.

[22] *Id*. at 40:19-20, 41:6-44:3.

[23] Glidden Decl. ¶¶ 14-15. Plaintiff disputes whether Chambers failed to comply with Glidden's commands to take his hands out of his pockets and cites to the taser video as evidence showing Chambers complied with Glidden's commands. However, Glidden had not drawn his taser at this point in the encounter and therefore does not support Plaintiff's assertion.

[24] Glidden Dep. 45:10-15, 47:12-14.

[25] *Id*. at 44:24-45:4.

[26] Glidden Decl. ¶ 16.

behind.[27]  Using his peripheral vision, Glidden saw Chambers start to pull his left hand from his jacket pocket and saw the butt of a pistol in Chambers' left hand.[28]

Upon seeing the butt of the pistol, Glidden grabbed Chambers' left hand, tried to push it back into his pocket, and seized Chambers with his other hand.[29]  Glidden yelled for Chambers to let go of the gun and get on the ground, as he physically struggled with him[30]  During the struggle, Glidden testified he felt Chambers pulling on Glidden's Glock pistol in its holster, jerking it, and attempting to pull it out.[31] Chambers, however, never gained control over Glidden's pistol.[32]  While still struggling to get Chambers to the ground, Glidden deployed his taser in an attempt to get Chambers under control.[33] Glidden heard the taser clicking and knew that he did not have a "good connection"; instead, Deputy Glidden received a shock from the taser and dropped it.[34]

That taser was equipped with a camera that began recording after Glidden pulled it during the struggle.  The camera recorded the next twenty seconds of the encounter.[35]  In that video, Glidden repeatedly yells at Chambers to get on the ground and tugs Chambers by the front of his shirt.  Chambers gets down on his hands and

---

[27] Glidden Dep. 53:2-4.
[28] Glidden Decl. ¶ 16; Glidden Dep. 53:4-7.
[29] Glidden Decl. ¶ 17.
[30] *Id*. at ¶ 18.
[31] *Id*. at ¶ 20.
[32] Glidden Dep. 62:18-20.
[33] Glidden Decl. ¶ 21.
[34] *Id*. at ¶¶ 22-23.
[35] *See* DVD: Taser Video [Doc. 22].

knees, and responds "I'm on the ground, sir!"  No weapon can be seen on the video.

The camera begins to shake, and Chambers disappears from the camera's view.  For the

next twelve seconds, the camera moves quickly, showing flashing unrecognizable

images before falling to the ground.  One can hear a single gunshot as the video comes

to an end.

After dropping the taser, Deputy Glidden lost control of Chambers.[36]  Glidden

testified that he held onto Chambers' jacket, but Chambers wriggled free of his jacket,

pulled away from Glidden, and fled towards the neighborhood where other deputies

and residents were located.[37]  Glidden held Chambers' jacket in his hand when it came

off, and he did not feel the weight of the gun he had seen seconds earlier in the jacket

pocket.[38]  Believing Chambers still had the gun, Glidden quickly threw the jacket aside

and retrieved the magazine to his Glock pistol from the ground nearby.[39]  Without

giving Chambers a verbal command to stop, Glidden fired his Glock pistol once, hitting

Chambers in the back of the head and killing him instantly.[40]  Glidden testified that he

shot Chambers because he believed Chambers was armed and presented an imminent

---

[36] Glidden Decl. ¶ 23.

[37] *Id.* at ¶¶ 23- 24.

[38] *Id.* at ¶ 24.

[39] *Id.* at ¶ 24; Glidden Dep. 64:24-65:1.

[40] Glidden Decl. ¶ 25; Glidden Dep. 66:2-4.  Glidden testified that he could not recall whether he gave a verbal command or not.  No verbal command can be heard on the taser video.  Construing the facts in the light most favorable to Plaintiff, the Court assumes for purposes of summary judgment that no command was given.

threat to the residents and deputies in the neighborhood.[41]  Glidden admitted he did not

see a gun in Chambers' possession at the time he shot him, and the undisputed facts

show Chambers was unarmed when he fled.[42]  Indeed, officers investigating the nearby

burglary arrived at the scene and found a .45 caliber handgun lying on the ground

roughly five feet from Chambers' jacket and Glidden's taser.[43]  The serial number on the

gun matched the one belonging to the gun taken from the burglarized house.[44]

At the time of the shooting, Deputy Glidden had been employed with the

Houston County Sherriff's Office for over five years, since May of 2005.[45]  In June 2006,

he completed basic law enforcement training and became a certified peace officer

through the Georgia Peace Officer's Standards & Training Council ("POST").[46]

After receiving his POST certification, Glidden began working as a patrol officer

and, at that time, received a copy of and reviewed the Houston County Sherriff's Office's

written use of force policy.[47]  That policy permits the use of deadly force against a fleeing

felon "if there is probable cause to believe that he has committed a crime involving the

infliction or threatened infliction of serious physical harm and that his/her escape might

---

[41] Glidden Decl. ¶ 25.

[42] Glidden Dep. 71:17-21; 74:18-19.

[43] *See* Deposition of Gregory Pennycuff 18:8-21, 34:11-36:9 ("Pennycuff Dep.") [Doc. 31]; *see also* Glidden Dep. 75:24-78:14.

[44] Pennycuff Dep. at 37:17-39:11.

[45] Glidden Decl. ¶ 2.

[46] *Id*.

[47] *Id*. at ¶ 3.

result in serious physical harm to another person."[48]  Glidden was trained on and was aware of the policy's standards for the use of deadly force.[49]  Since receiving his initial certification, he has received annual POST certified training, including annual training on the use of deadly force and firearms qualifications and has maintained his POST certification.[50]

## DISCUSSION

Following the shooting, Chambers' mother, Plaintiff Sharese Wells, in her capacity as the Administrator of his Estate, filed this suit pursuant to 42 U.S.C. § 1983 against Deputy Glidden, in his individual capacity, and Sheriff Cullen Talton, in his official capacity as Sheriff of Houston County, alleging that Deputy Glidden's use of deadly force and Sheriff Talton's ratification of Glidden's actions, as well as his policies and customs regarding the use of such force, violated Chambers' Fourth and Fourteenth Amendment rights.  Plaintiff also asserts state law wrongful death claims against both Defendants pursuant to O.C.G.A. § 51-4-5. Defendants now move for summary judgment on all of Plaintiff's claims on the grounds that Glidden's use of deadly force was reasonable and did not violate clearly established law.  In response, Plaintiff argues

---

[48] Use of Force Policy, Section C [Doc. 20-1].
[49] Glidden Decl. ¶ 31.
[50] *Id.* at ¶ 5.

that Glidden's use of force against an unarmed fleeing suspect was unconstitutional under well settled law, and, therefore, summary judgment should be denied.

## I.  Evidentiary Dispute

Before analyzing the merits of the Motion, the Court will first address Plaintiff's argument that evidence in the record rebuts Glidden's testimony that Chambers was armed with the stolen gun during the encounter.  In order to create an issue of material fact, the nonmovant must point to specific evidence in the record.[51]  Plaintiff cites to the taser video and contends that the video shows Chambers was completely unarmed. The taser video, however, does not show as much as Plaintiff suggests.  Neither Chambers' left hand nor his jacket pockets are visible on the taser video.  Moreover, Glidden saw the gun before the video began recording. It was only <u>after</u> he saw the gun that the struggle began, and he activated the taser.  Thus, the taser video cannot rebut Glidden's testimony regarding events that occurred before the taser even began recording.

Plaintiff also points to the lack of Chambers' DNA and fingerprints on the gun found at the scene as evidence creating a genuine issue of material fact regarding whether Chambers was armed.   There is no evidence, however, that the gun was tested for fingerprints.  Thus, any inference regarding the presence or absence of fingerprints is

---

[51] *See* L.R., Ga. M.D. 56 ("All material facts contained in the movant's statement which are not specifically controverted by specific citation to the particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate."); *see also McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) ("For factual issues to be considered genuine, they must have a real basis in the record.").

merely speculative.  The Court will not draw any inference in favor of either party based on a lack of DNA or fingerprint evidence when there is no indication the gun was even tested for such prints.[52] "In determining whether summary judgment is appropriate, [the court is] required to draw all <u>reasonable</u> inferences in favor of the non-moving party, not all <u>possible</u> inferences."[53]   For these reasons, Plaintiff fails to create a genuine issue of material fact as to whether Chambers was armed.

## II.  § 1983 Claims

Defendants argue they are entitled to summary judgment on Plaintiff's § 1983 claims because Deputy Glidden is protected by qualified immunity, and Sheriff Talton is protected by Eleventh Amendment immunity.  Plaintiff only responded to Defendants' arguments regarding qualified immunity, arguing Deputy Glidden's use of deadly force was constitutionally excessive and violated clearly established law.  The Court, however, disagrees and, after carefully considering the arguments and the record in this case, finds that Glidden's use of deadly force was reasonable and did not violate clearly established law; thus, Deputy Glidden is entitled to qualified immunity.  The Court further finds Sherriff Talton is entitled to Eleventh Amendment immunity.

### A.  Fourth Amendment Claim against Deputy Glidden

---

[52] *Accord Beckett-Crabtree v. Hair*, No. 06-CV-0683CVEFHM, 2007 WL 3311393, at *2 n.5 (N.D. Okla. Nov. 6, 2007), *aff'd sub nom.*, *Beckett-Crabtree ex rel. Estate of Crabtree v. Hair*, 298 F. App'x 718 (10th Cir. 2008).
[53] *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011) (emphasis added).

"[Q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."[54] As the Supreme Court recently reiterated, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law."[55]  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation."[56] Qualified immunity is immunity from suit and should be resolved as early as possible in the case.[57]

When an officer invokes qualified immunity, the initial burden is on the officer to show that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."[58]  Once the officer satisfies that burden, the burden then shifts to the plaintiff to show that (1) a violation of a constitutional right occurred, and (2) that right was "clearly established" at the time of the violation.[59]

Here, it is clear that Deputy Glidden was acting within the scope of his discretionary authority as a deputy when he stopped and seized Chambers.  Therefore,

---

[54] *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quotation marks omitted).
[55] *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015).
[56] *Lee*, 284 F.3d at 1194.
[57] *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).
[58] *Lee*, 284 F.3d at 1194.
[59] *Pearson*, 555 U.S. at 232.

the burden shifts to Plaintiff to prove that Glidden's use of deadly force violated Chambers' clearly established Fourth Amendment rights. Plaintiff cannot meet that burden on the facts of this case.

### i. Constitutional Violation

The Fourth Amendment's prohibition against unreasonable searches and seizures encompasses the right to be free from excessive force.[60]  Accordingly, excessive force claims arising out of a stop or seizure are governed by the Fourth Amendment's objective reasonableness standard.[61]  The reasonableness inquiry is objective—the issue is whether Deputy Glidden's use of deadly force was "objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation."[62]  When determining whether an officer's use of force is reasonable, the Eleventh Circuit instructs:

> [W]e are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal.[63]

---

[60] *Lee*, 284 F.3d at 1197 (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)).
[61] *Graham*, 490 U.S. at 395.
[62] *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333 (11th Cir. 2004) (quotation marks omitted).
[63] *Id.* at 1333-34.

To aid in the reasonableness analysis, the Court "measure[s] the quantum of force employed against these factors—the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight."[64]   In the deadly force context, the Court should also consider whether the officer:

> (1) "[H]as probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm;" (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible."[65]

"Also relevant is whether the officer 'had [an] articulable basis to think [the suspect] was armed.'"[66]   Though the Court should consider each of these factors, "[t]he Supreme Court has emphasized that there is no precise test or 'magical on/off switch' to determine when an officer is justified in using excessive or deadly force."[67] "Nor must every situation satisfy certain preconditions before deadly force can be used."[68]   "[I]n the end we must still slosh our way through the factbound morass of reasonableness."[69]

---

[64] *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009).

[65] *Vaughan v. Cox*, 343 F.3d 1323, 1329-30 (11th Cir. 2003) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)) (emphasis omitted).

[66] *Salvato v. Miley*, -- F.3d --, No. 14-12112, 2015 WL 3895455, at *5 (11th Cir. June 25, 2015) (quoting *Garner*, 471 U.S. at 20).

[67] *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 382 (2007)).

[68] *Garczynski*, 573 F.3d at 1166.

[69] *Scott*, 550 U.S. at 383 (quotation marks omitted).

Based on the facts and circumstances confronting Deputy Glidden, this Court finds his use of the deadly force objectively reasonable.  First, Glidden had probable cause to believe that Chambers had committed a serious crime—burglary in which a loaded gun went missing.  Glidden testified that he encountered Chambers in the wooded area near the burglarized house.  Chambers refused to obey Glidden's commands to remove his hands from his pockets, and, as he passed by, Glidden testified he saw the butt of a gun in Chambers' left hand.  Though Glidden did not know whether Chambers was involved in the burglary when he first encountered him, the development of these facts provided Glidden with probable cause to believe Chambers had committed the burglary.[70]

Second, Glidden had an articulable basis for believing Chambers was armed with the loaded gun when he fled.  Glidden testified he saw the butt of a gun in Chambers' left hand as he began pulling it from his jacket pocket, and the undisputed facts show that Glidden never gained control of that gun.  At the time Chambers fled, Glidden had a grasp on nothing but Chambers' jacket, and he could not feel the weight of the gun in the pocket.  Thus, Glidden reasonably believed Chambers still had the gun in his possession when he fled.  The fact that it was later determined Chambers was not

---

[70] While emphasizing that burglary is a serious crime, the Court in no way suggests that burglary alone justifies the use of deadly force. *See Garner*, 471 U.S. at 21 ("While we agree that burglary is a serious crime, we cannot agree that it is so dangerous as automatically to justify the use of deadly force"). Rather, it is a relevant factor that affects the reasonableness analysis.

armed does not make Deputy Glidden's belief at the time unreasonable.  It is well settled that a reasonable mistake regarding whether a suspect is armed does not defeat the protection of qualified immunity.[71]  Based on the facts known to him at the time, Glidden reasonably believed Chambers had a gun on his person.

Third, an objectively reasonable officer in Glidden's position would have probable cause to believe Chambers—a man he believed to be armed with a loaded gun—posed a threat of serious physical harm to other officers in the area.  Plaintiff argues there were no other persons in the vicinity, and therefore, no reasonable basis existed to believe that Chambers posed a threat to others.  The record, however, shows that Chambers fled towards the neighborhood where the burglary occurred, and other officers were in the area of the house when the shot was fired.  Accordingly, Deputy Glidden had probable cause to belief Chambers posed a threat to those officers.

Fourth, an objectively reasonable officer in Glidden's position would believe that deadly force was necessary to prevent Chambers' escape and avert the threat of harm. The record shows Chambers failed to obey Glidden's commands and resisted arrest. Glidden commanded Chambers to remove his hands from pockets.  Chambers did not

---

[71] *See Penley v. Eslinger*, 605 F.3d 843, 854 (11th Cir. 2010) (finding officer's use of deadly force was reasonable where suspect held a toy gun he had modified to look like a real gun); *Quiles v. City of Tampa Police Dep't*, 596 F. App'x 816, 820 (11th Cir. 2015) (finding officer who shot fleeing suspect under reasonable, but mistaken, belief that the suspect had stolen fellow officer's gun was entitled to qualified immunity).

comply.   Glidden ordered Chambers to get on the ground.  Chambers physically resisted.  Glidden deployed his taser but missed the target.  Chambers got on his hands and knees, but only for a matter of seconds.  Chambers then wriggled free of his jacket and fled.  When his verbal commands and physical force proved unsuccessful to subdue Chambers, only then did Glidden resort to deadly force to apprehend a person he believed to be armed.  Because none of his prior attempts to subdue Chambers were successful, Glidden reasonably believed that deadly force was necessary to prevent escape.

As to the final factor—warning of the intent to resort to deadly force—the Court finds that Glidden's failure to warn Chambers does not create a genuine issue of material fact as to whether his use of deadly force was reasonable.  "[A]n officer's failure to issue a seemingly feasible warning—at least, to a person appearing to be armed—does not, in and of itself, render automatically unreasonable the use of deadly force."[72] Here, a mere twelve seconds elapsed between Chambers' disappearance from the taser video's view and the fatal gunshot.  Thus, Glidden had a matter of seconds to stop a man, who he had seen with a gun, fleeing towards other officers.  With only a few seconds to react, failing to give a warning to a potentially armed suspect does not render Deputy Glidden's use of deadly force constitutionally unreasonable.

---

[72] *Quiles*, 596 F. App'x at 820.

In that regard, the circumstances of this case are distinguishable from those in *Salvato v. Miley*,[73] where the Eleventh Circuit recently held that, viewing the facts in the light most favorable to the plaintiff in that case, the use of deadly force to stop a fleeing suspect was excessive.[74]   In *Salvato*, the initial crime was not serious—the man was seized for "yelling and cussing at passing cars,"[75] not burglary in which a loaded gun went missing.  Additionally, at the time the officer in *Salvato* shot the man in the abdomen, the man was "apparently unarmed,"—he was shirtless, with nothing in his hands, and the officer did not see a gun in his waistband.[76]   Here, by contrast, Chambers' back was facing Glidden when fled, and Glidden could not see what he had in his hands.  Given that Glidden previously saw a gun in Chambers' left hand, he had reason to believe Chambers was armed with that gun when he fled.  Under these circumstances, the use of deadly force was reasonable.

### ii.  Clearly-Established Law

Assuming *arguendo* Plaintiff could establish a Fourth Amendment violation, to overcome qualified immunity, Plaintiff must also show that Deputy Glidden's conduct violated clearly established law.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer

---

[73] -- F.3d --, No. 14-12112, 2015 WL 3895455 (11th Cir. June 25, 2015).
[74] *Id.* at *5.
[75] *Id.*
[76] *Id.* at *1, 5.

18

that his conduct was unlawful in the situation he confronted."[77]   In other words, the issue is whether the law gave the officer "fair warning" that his conduct was unconstitutional.[78]   When determining whether the law is clearly established, factually similar cases are "usually . . . needed to demonstrate that officials were fairly warned that their application of force violated the victim's constitutional rights."[79]   In conducting the clearly-established analysis, "the district court should compare the facts of the case before the court that allege a constitutional deprivation with those cases that the party opposing the motion contends show the clearly established nature of the law."[80]   To find such cases, the Court must look only "to law as decided by the Supreme Court, the Eleventh Circuit, or the Supreme Court of [Georgia]."[81]   Plaintiff cites three cases to show that clearly established law gave Glidden fair warning that his conduct was unlawful.  Each of these cases, however, is factually distinguishable from this case.

Plaintiff first cites to *Tennessee v. Garner*,[82] the pivotal Supreme Court case establishing the reasonableness of deadly force to apprehend a fleeing suspect.  In that case, a police officer responded to a residential burglary, saw the suspect run out the

---

[77] *Saucier v. Katz*, 533 U.S. 194, 202 (2001).
[78] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).
[79] *Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003).
[80] *Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015).
[81] *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013).
[82] 471 U.S. 1 (1985).

back door, and shot him before he could climb the fence to escape.[83]   Unlike the facts of this case, however, at the time the officer shot the suspect in *Garner*, he could see the suspect's hands, saw "no signs of a weapon," and was "reasonably sure" the suspect was unarmed.[84]   The Supreme Court held an officer's use of deadly force to apprehend a unarmed, nondangerous fleeing suspect unreasonable.[85]   In the case at bar, by contrast, Deputy Glidden not only saw "signs" of a weapon, but testified he actually saw the butt of a gun in Chambers' left hand.   Moreover, although at the time he shot Chambers he did not see the gun, he had a reasonable belief Chambers was armed because he knew a gun went missing from the house, had seen a gun in Chambers' left hand in the jacket pocket, and could not feel the weight of the gun in the pocket when Chambers fled. Accordingly, *Garner* did not put Glidden on notice that he conduct was unlawful.

Second, Plaintiff cites to *Palmer v. Hall.*[86]   In that case, officers responded to a call that boys were shooting guns within city limits, a misdemeanor offense.[87]   When the police arrived, the boys scattered, and one of the officers began chasing a twelve-year-old boy who was holding a BB gun.[88] Despite the officer's command to stop and drop

---

[83] *Id.* at 3-4.
[84] *Id.* at 3.
[85] *Id.* at 11, 21.
[86] 517 F.2d 705 (1975).
[87] *Id.* at 705-07.
[88] *Id.* at 706.

the weapon, the boy kept running.[89]  At the bench trial, the officer testified that the boy looked back in such a way that the barrel of the gun pointed towards him, and fearing for his life, shot the boy in the leg.[90] The *Palmer* court, however, rejected the officer's version of the events because the officer's testimony was inconsistent with the direction of the bullet, which suggested that the child was facing ahead when the bullet was fired; thus, the court found the officer's use of deadly force unconstitutional.[91]

The factual scenario facing Deputy Glidden differs from the one facing the officer in *Palmer* in three key ways.  First, the officer in *Palmer* believed the boy had committed a misdemeanor offense; whereas when Deputy Glidden saw the gun in Chambers' pocket, he had probable cause to believe Chambers committed felony burglary.  Second, the boy in *Palmer* did not physically resist the officer as Chambers did here.  Third, and most important, there is no indication that the boy in *Palmer* was running towards anyone or that he posed a threat to others. The officer's sole justification for using deadly force in *Palmer* was that he feared for his own safety.  Here, by contrast, Chambers ran towards a neighborhood where other officers were located.  Therefore, Deputy Glidden had probable cause to believe he posed a threat of harm to others.

---

[89] *Id*.
[90] *Id*. at 706-07.
[91] *Id*. at 707.

Lastly, Plaintiff cites *Samples v. City of Atlanta*.[92]  In *Samples*, the officer noticed the suspect "screaming like a demented person in a phone booth."[93]  When he approached the suspect to question him, the officer testified the suspect threw a soda bottle at him, pulled out a knife from his pocket, began opening it, and approached the officer.[94]  The officer testified he feared for his life, so he shot the suspect six times.[95]  The court held that an issue of material fact existed as to whether the use of deadly force was excessive because circumstantial evidence contradicted the officer's version of the events.[96]  Namely, the knife found near the suspect's body was unopened, and one of the bullets hit the suspect in the back, suggesting the he may have turned to run away.[97]  In addition, the court noted that the knife itself was small with nothing more than a three-inch blade.[98]  Here, by contrast, Deputy Glidden was not responding to a call that someone was yelling in a phone booth, but instead was investigating a burglary in which a loaded gun went missing.  Moreover, Glidden believed Chambers was armed, not with a small three-inch knife, but a loaded .45 caliber pistol.  Thus, *Samples* is not sufficiently similar to put Glidden on notice that his conduct was unlawful.

---

[92] 846 F.2d 1328 (11th Cir. 1988).

[93] *Id.* at 1331.

[94] *Id.*

[95] *Id.*

[96] *Id.* at 1332.

[97] *Id.*

[98] *Id.*

In addition, none of these three cases involved a suspect fleeing towards an area where the officer knew others were located.  Here, Glidden knew that other officers were in the area assisting in the burglary investigation and believed Chambers posed a threat to those officers.  Accordingly, these cases lack a materially similar factual basis to put Glidden on notice that his conduct violated Chambers' constitutional rights.

Plaintiff further argues that even in the absence of materially similar case law, Glidden is not entitled to qualified immunity.  To be sure, the Eleventh Circuit recognizes a "narrow exception" when factually similar case law is unnecessary to overcome qualified immunity in excessive force cases.[99]  The exception applies when "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw.'"[100]  "To come within this narrow exception, a plaintiff must show that the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on point."[101]

Plaintiff contends that "[s]hooting at an unknown, unarmed person who is running away from police is precisely the kind of obviously unlawful conduct covered

---

[99] *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000).
[100] *Id.*
[101] *Id.* (quotation marks and brackets omitted).

23

by this principle."[102]   Plaintiff's argument, however, over-simplifies and misconstrues the factual scenario rapidly unfolding before Deputy Glidden. As thoroughly explained above, Glidden knew a loaded gun was missing from the burglarized house when he encountered Chambers—a man who refused to comply with Glidden's commands to remove his hands from his pockets, had a gun in his left hand, physically resisted Glidden, and fled in the direction of other officers.   When Chambers fled, Glidden did not have control over the gun he previously saw in Chambers' pocket and believed Chambers was still armed. The unlawfulness of deadly force in this scenario was not readily apparent to Glidden in the total absence of factually similar case law. As such, Plaintiff fails to show that this case falls within the narrow exception, and qualified immunity bars Plaintiff's Fourth Amendment claim against Glidden.

### B.  Fourteenth Amendment Claims against Glidden

Plaintiff further alleges that Glidden's conduct violated Chambers' due process and equal protection rights guaranteed by the Fourteenth Amendment.   Because Plaintiff's excessive force claim arises during the course of "an arrest or investigatory stop of a free citizen," it is analyzed under the Fourth Amendment's reasonableness standard, not the Fourteenth Amendment's Due Process Clause.[103]   Additionally, because Glidden's use of deadly force was objectively reasonable under the Fourth

---

[102] Pl.'s Resp., p. 17 [Doc. 26].
[103] *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).

Amendment, the Equal Protection claim premised on that same conduct fails as a matter of law.[104]

### C.  § 1983 Claims against Sheriff Talton

Plaintiff also asserts § 1983 claims against Sheriff Talton, alleging that he violated Chambers' constitutional rights by failing to discipline Glidden for his use of excessive force, maintaining a policy or custom which ratified the use of unreasonable force against fleeing suspects, enforcing an informal code of officer-to-officer loyalty that required officers to remain silent about the actions of other officers, and failing to train officers on the proper use of force.  Since Plaintiff fails to show that Glidden's use of force was unconstitutional, Plaintiff's claims against Sheriff Talton also fail.[105]  Even if, however, the facts demonstrated a potential constitutional violation, Sheriff Talton would nevertheless be entitled to summary judgment because: (1) the § 1983 claims are barred by Eleventh Amendment immunity; and (2) there is no evidence in the record showing he adopted or

---

[104] *See Jennejahn v. Vill. of Avon*, 575 F. Supp. 2d 473, 482 (W.D.N.Y. 2008) ("[The plaintiff's] failure to demonstrate the existence of any disputed material facts concerning his excessive force claim similarly forecloses any equal protection claim based on excessive force"); *Radford v. Johnson*, No. 4:05 CV 80(CDL), 2006 WL 2927578, at *8 (M.D. Ga. Oct. 12, 2006) ("Without evidence of excessive force, a claim of racial discrimination based on the degree of excessive force is without merit.").

[105] *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1170-71 (11th Cir. 2009) (finding that in the absence of a constitutional violation, there was no need to explore sheriff office's policies); *Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009) (agreeing with district court that "absent a violation of [the plaintiff's] constitutional rights by [the officer], both [the sheriff] and the City . . . are entitled to summary judgment."); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) (finding it unnecessary to inquire into a county's failure to train officers when there was no underlying constitutional violation).

implemented a policy of using unreasonable force or that he failed to train officers on the proper use of force.

### i. Eleventh Amendment Immunity

Sheriff Talton first argues he is entitled to Eleventh Amendment immunity because he acted as an agent of the state, not the county, when he created and implemented the use of force policy.   "Eleventh Amendment immunity bars suits brought in federal court . . . when an 'arm of the State' is sued.[106]  "Whether a defendant is an 'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise."[107]  The Eleventh Circuit in *Manders v. Lee* held that a Georgia sheriff acts as an arm of the State when "establishing use-of-force policy at the jail and in training and disciplining his deputies in that regard."[108]  This Court later explained that the logic in *Manders* is not limited to a sheriff's use of force policy in the jail but rather extends to the use of force used to stop and detain suspects as well.[109]  Based on this authority, the

---

[106] *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003).

[107] *Id*.

[108] *Id*. at 1328.

[109] *Beaulah v. Muscogee Cnty. Sheriff's Deputies*, 447 F. Supp. 2d 1342, 1356-57 (M.D. Ga. 2006) ("[T]he Eleventh Circuit found that 'counties exercise no authority or control over the sheriff's force policy, whether in making arrests on the streets or in quelling disruptive inmates at the jail.'" (quoting *Manders*, 338 F.3d at 1310)), *order vacated in part sub nom., Walker v. Johnson*, No. 4:04-CV-161 (CDL), 2008 WL 442328 (M.D. Ga. Feb. 14, 2008); *see also Mladek v. Day*, 293 F. Supp. 2d 1297, 1304 (M.D. Ga. 2003) (relying on *Manders* to find that finding sheriff was entitled to Eleventh Amendment immunity arising from performance of law enforcement function of arresting and detaining criminal suspects).

Court finds that Sheriff Talton acted as an arm of the State in establishing and implementing the use of force policy at issue in this case and is therefore entitled to Eleventh Amendment immunity.

### ii. Municipal Liability

Even if Eleventh Amendment immunity did not apply, and Sherriff Talton was acting instead as an agent of Houston County, he would nevertheless be entitled to summary judgment.  "[W]hen an officer is sued under § 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent."[110]  Therefore, suits against officers in their official capacity are in reality suits against the government agency for which the officer acts.[111]  Counties and local governments are considered "persons" subject to suit under § 1983.[112]  A county, however, cannot be held liable solely on a theory of *respondeat superior* for the wrongful acts of its police officers.[113]  Instead, to hold a county liable under § 1983, a party must identify an official policy, practice, or custom caused the constitutional violation.[114]  Accordingly, to hold Sheriff Talton liable as an agent of Houston County, Plaintiff must show he implemented a policy or custom that caused a violation of Chambers'

---

[110] *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (quotation marks and footnote omitted).
[111] *Id.*
[112] *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978)).
[113] *McDowell,* 392 F.3d at 1289.
[114] *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003).

constitutional rights.

In this case, Plaintiff alleges that Sheriff Talton (1) maintained a policy or custom of ratifying the use of unreasonable force and a code of officer-to-officer loyalty, which encouraged officers to remain silent regarding a fellow officer's actions regardless of the legality of those actions, and (2) failed to train subordinate officers on the proper use of force to apprehend fleeing suspects.  Sheriff Talton, however, is entitled to summary judgment under both theories of liability.

First, Plaintiff fails to point to any evidence in the record showing that Sheriff Talton maintained a policy, custom, or practice ratifying the use of unreasonable force and/or a code of officer-to-officer loyalty.  "As a general rule, an isolated incident, however unfortunate, does not demonstrate evidence of [a county's] persistent or widespread policy and will not be considered so pervasive as to be a custom or practice."[115]  The record is devoid of any prior incidents of excessive force by Houston County officers from which it could be inferred that Sheriff Talton ratified the use of such force or enforced an informal code of officer-to-officer loyalty.

Second, Plaintiff fails to point to any evidence showing a failure to train officers on the proper use of force to apprehend fleeing suspects.  The Supreme Court instructs that there are "limited circumstances" when a failure to train can form the basis for §

---

[115] *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1264 (11th Cir. 2010) (internal quotation marks and citations omitted).

1983 liability.[116] "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as . . . 'policy or custom' that is actionable under § 1983."[117] "To establish . . . such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."[118] "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise."[119]

Here, the use of force policy utilized at the Houston County Sherriff's Office allows the use of deadly force to apprehend a fleeing felon "if there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm and that his/her escape might result in serious physical harm to another person."[120] Plaintiff does not argue that this policy was constitutionally deficient, and the Court finds it to be consistent with the constitutional parameters outlined in *Tennessee v. Garner*.[121] The undisputed evidence shows that Glidden was trained and certified on the proper use of force and knew when he could resort to

---

[116] *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989).
[117] *Id.* at 389.
[118] *Gold*, 151 F.3d at 1350 (quotation marks omitted).
[119] *Id.* at 1351.
[120] Use of Force Policy, Section C [Doc. 20-1].
[121] 471 U.S. 1 (1985).

deadly force under the terms of the policy.  Moreover, there is no evidence in the record showing prior incidents of excessive force by officers to put Sheriff Talton on notice of the need for further training.  Accordingly, Plaintiff fails to present any evidence of an official policy or custom upon which to hold Sheriff Talton liable as an agent of Houston County.  Thus, Sherriff Talton is entitled to summary judgment on Plaintiff's §1983 claims against him in his official capacity.

## II.  State Law Wrongful Death Claim

### A.  Glidden and Official Immunity

In addition to the § 1983 claims, Plaintiff raises a state law wrongful death claim against Glidden pursuant to O.C.G.A. § 51-4-5.  Glidden now moves for summary judgment on this claim, arguing that official immunity bars Plaintiff's claim.  Plaintiff does not respond to this argument.

Under Georgia law, an officer is entitled to official immunity for injuries caused by his actions unless he negligently performed "ministerial functions" or performed "official functions" "with actual malice or with actual intent to cause injury."[122]  Georgia courts define "official functions" as "any act performed within the officer's or employee's scope of authority, including both ministerial and discretionary acts."[123]

---

[122] *Gilbert v. Richardson*, 264 Ga. 744, 753 (1994) (quoting Ga. Const. art. I, § II, ¶ IX(d)).
[123] *Gilbert*, 264 Ga. at 753.

Here, as mentioned above, Glidden was performing a discretionary function when he decided to stop and seize Chambers.[124]   Therefore, to overcome official immunity, Plaintiff must provide sufficient evidence to suggest that Glidden acted with "actual malice or with actual intent to cause injury."

"The bar for proving malice or an intent to cause injury is high."[125]

> [A]ctual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact. Actual malice does not include implied malice, or the reckless disregard for the rights and safety of others. A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiff[]. Likewise, the phrase "actual intent to cause injury" has been defined in a tort context to mean an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive.[126]

Construing the facts in the light most favorable to Plaintiff, there is no evidence showing Glidden acted with malice or an intent to cause injury.   Indeed, the uncontroverted evidence shows Glidden believed the use of deadly force was necessary to prevent death or serious bodily harm to other deputies and residents in the neighborhood in the direction of where Chambers was fleeing.   Accordingly, Glidden is entitled to summary judgment on Plaintiff's state wrongful death claim.

### B.  Sheriff Talton and Sovereign Immunity

---

[124] *See also Kidd v. Coates*, 271 Ga. 33, 33 (1999); *Tittle v. Corso*, 256 Ga. App. 859, 861-62 (2002).

[125] *Schwartz v. Gwinnett Cnty., Ga.*, 924 F. Supp. 2d 1362, 1378 (N.D. Ga. 2013).

[126] *Marshall v. Browning*, 310 Ga. App. 64, 67-68 (2011).

Similarly, Sheriff Talton is entitled to judgment as a matter of law on Plaintiff's wrongful death claim.   Under state law, Georgia counties enjoy the protection of sovereign immunity and can only be sued if they have explicitly waived that immunity.[127]   Furthermore, "[a] lawsuit against a sheriff in his official capacity is considered a suit against the county, and the sheriff is entitled to assert any defense or immunity that the county could assert, including sovereign immunity."[128]   "Sovereign immunity is not an affirmative defense that must be established by the party seeking its protection. Instead, immunity from suit is a privilege and the waiver must be established by the party seeking to benefit from the waiver."[129]   Plaintiff offers no evidence showing a waiver of sovereign immunity in this case, nor is the Court aware of one.   Accordingly, Sherriff Talton is entitled to summary judgment on Plaintiff's wrongful death claim against him in his official capacity.

## CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment [Doc. 20] is **GRANTED.**

---

[127] *Strength v. Lovett*, 311 Ga. App. 35, 38 (2011).
[128] *Id.* (citing *Gilbert*, 264 Ga. at 746(2) n.4).
[129] *Athens-Clarke Cnty. v. Torres*, 246 Ga. App. 215, 216 (2000).

**SO ORDERED,** this 5th day of August, 2015.

S/  C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE